IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF KANSAS

|  |  |
|---|---|
| **KEYNA LEONARD as the surviving daughter of decedent, ARLEN DORITY and Keyna Leonard As ADMINSITRATOR OF THE ESTATE OF ARLEN DORRITY**<br>Address:<br>808 Hickory Street<br>PO Box 395<br>Wakefield, KS 67487<br><br>**Plaintiff(s),**<br><br>v.<br><br>**HMG PARK MANOR OF SALINA, LLC D/B/A SMOKY HILL REHABILITATION CENTER**<br>Serve Registered Agent:<br>Cogency Global Inc.<br>2101 SW 21st Street<br>Topeka, KS 66604<br><br>**HEALTHMARK GROUP, LTD**<br>Serve Registered Agent:<br>Cogency Global Inc.<br>850 New Burton Road Suite 201<br>Dover, DE 19904<br><br>**HMG HEALTHCARE LLC**<br>Serve Registered Agent:<br>Cogency Global Inc.<br>850 New Burton Road Suite 201<br>Dover, DE 19904<br><br>**HMG SERVICES, LLC**<br>Serve Registered Agent:<br>Cogency Global Inc.<br>850 New Burton Road Suite 201<br>Dover, DE 19904<br><br>**Defendant(s).** | Case No.<br><br>Division No.<br><br>JURY TRIAL DEMANDED |

**PLAINTIFF(S) COMPLAINT FOR DAMAGES**

 *Filing of*
*Steele Chaffee*

1

The Plaintiff(s), by and through undersigned counsel, submits this Petition for Damages against the above-named Defendant(s), and in further support, states and alleges as follows:

## PLAINTIFF(S)

1.     Arlen Dority ("Resident") suffered from an avoidable fall and hip fracture on April 18, 2021, at Hmg Park Manor of Salina, LLC d/b/a Smoky Hill Rehabilitation Center, which is a Kansas skilled nursing facility located at 1007 Johnstown Avenue, Salina, KS, 67401.

2.     Resident died from the avoidable fall and hip fracture on April 19, 2021.

3.     Plaintiff(s), Keyna Leonard, is, and at all times relevant hereto, an adult over the age of 21 and a resident of Kansas.

4.     Plaintiff(s) is a surviving daughter of Resident, and therefore, a member of the class of individuals authorized to pursue a wrongful death claim pursuant to K.S.A. § 60-1902.

5.     Keyna Leonard is the Administrator of the Estate of Arlen Dorrity pursuant to Letters of administration issued June 22, 2021, Case Number 2021-PR-000010, Ottawa County, Kansas.

## DEFENDANTS

6.     Plaintiff(s) incorporates by reference the allegations previously set forth and further alleges as follows:



*Filing of Steele Chaffee*

**Hmg Park Manor of Salina, LLC d/b/a Smoky Hill Rehabilitation Center ("SHRC")**

7.      At all times relevant, Hmg Park Manor of Salina, LLC d/b/a Smoky Hill Rehabilitation Center ("SHRC") was a Texas limited liability company and owned, operated, managed, maintained, and/or controlled, in whole or in part, and did business as Smoky Hill Rehabilitation Center ("Facility" or "the Facility") which is a Kansas skilled nursing facility located at 1007 Johnstown Avenue, Salina, KS, 67401.

8.      As such, SHRC was engaged in providing ancillary medical services to persons requiring such services, including Resident, by owning, operating, managing, maintaining, and controlling the Facility

9.      Consequently, SHRC, owed a duty to Resident to use reasonable care for Resident's safety while under the care and supervision at the Facility.

**HEALTHMARK GROUP, LTD ("HGT")**

10.     At all times relevant to this action, Defendant Healthmark Group, LTD ("HGT") was a Texas company and was engaged in providing ancillary medical services to persons requiring such services, including Resident, by owning, operating, managing, maintaining, and controlling the Facility.

11.     At all times relevant, HGT, and/or individuals or entities acting on its behalf, owned, operated, managed, maintained, and/or controlled – in whole or in part – the Facility.

12.     HGT, and/or individuals or entities acting on its behalf operated, managed, maintained, and/or controlled the Facility by providing nursing consulting services and exercising control over:



Filing of
Steele Chaffee

3

    a.   Staffing budgets;

    b.   The development and implementation of nursing policies and procedures;

    c.   The hiring and firing of the administrator; and

    d.   Training and supervising nursing staff persons.

13.    These actions and business decisions had a direct impact on the care provided to all residents including Resident.

14.    Consequently, HGT owed a duty to Resident to use reasonable care for Resident's safety while under care and supervision at the Facility.

### HMG Healthcare LLC ("HMGH")

15.    At all times relevant to this action, Defendant Recover-Care Healthcare LLC ("HMGH") was a Texas limited liability company and was engaged in providing ancillary medical services to persons requiring such services, including Resident, by owning, operating, managing, maintaining, and controlling the Facility.

16.    At all times relevant to this action, HMGH, and/or individuals or entities acting on its behalf, operated, managed, maintained, and/or controlled, in whole or in part, the Facility.

17.    HMGH, and/or individuals or entities acting on its behalf, operated, managed, maintained, and controlled the Facility by exercising final authority over:

    a.   Staffing budgets;

    b.   The development and implementation of nursing policies and procedures;

    c.   The hiring and firing of the administrator; and

    d.   Appointing the governing body that is legally responsible for establishing and implementing policies regarding the management and operation of the Facility.



18.    These actions and business decisions had a direct impact on the care provided to all residents including Resident.

19.    Consequently, HMGH owed a duty to Resident to use reasonable care for Resident's safety while under its care and supervision at the Facility and breached said duty for all the reasons stated in this Petition.

### HMG Services, LLC ("HMGS")

20.    At all times relevant to this action, Defendant HMG Services, LLC ("HMGS") was a Texas limited liability company and was engaged in providing ancillary medical services to persons requiring such services, including Resident, by owning, operating, managing, maintaining, and controlling the Facility.

21.    At all times relevant to this action, HMGS, and/or individuals or entities acting on its behalf, operated, managed, maintained, and/or controlled, in whole or in part, the Facility.

22.    HMGS and/or individuals or entities acting on its behalf, operated, managed, maintained, and controlled the Facility by exercising final authority over:

    a.   Staffing budgets;

    b.   The development and implementation of nursing policies and procedures;

    c.   The hiring and firing of the administrator; and

    d.   Appointing the governing body that is legally responsible for establishing and implementing policies regarding the management and operation of the Facility.

23.    These actions and business decisions had a direct impact on the care provided to all residents including Resident.



24.    Consequently, HMGS owed a duty to Resident to use reasonable care for Resident's safety while under its care and supervision at the Facility and breached said duty for all the reasons stated in this Petition.

## DEFENDANTS' JOINT ENTERPRISE/VENTURE

25.    Plaintiff(s) incorporates by reference the allegations previously set forth and further alleges as follows:

26.    Defendants SHRC, HGT; HMGH; and HMGS ("Joint Venture Defendants") were engaged in a joint venture in that:

    a.    The Joint Venture Defendants had an agreement, express and/or implied, among the members of the group to operate the Facility, a Kansas licensed nursing home;

    b.    The Joint Venture Defendants had had a common purpose to operate the Facility, a Kansas licensed nursing home;

    c.    The Joint Venture Defendants had a community of pecuniary interest in the operation of the Facility, a Kansas licensed nursing home; and

    d.    The Joint Venture Defendants had had an equal right to a voice in the direction of the operation of the Facility, a Kansas licensed nursing home.

27.    There has been a close relationship between the Joint Venture Defendants at all times relevant.

28.    As a consequence of the joint venture, the Joint Venture Defendants owed a joint duty to Resident to use reasonable care for their safety while under their care and supervision at the Facility.

## JURISDICTION AND VENUE

29.    Plaintiff(s) incorporates by reference the allegations previously set forth and further alleges as follows:


*Filing of*
*Steele Chaffee*

30.     Defendant Hmg Park Manor of Salina, LLC's members are all Residents and citizens of states other than Kansas.

31.     Defendant HMG Services, LLC's members are all Residents and citizens of states other than Kansas.

32.     Defendant HMG Healthcare, LLC's member are all Residents and citizens of states other than Kansas.

33.     Healthmark Group, LTD's principal place of business is in Texas and therefore is a citizen of a state other than Kansas.

34.     Therefore, Plaintiff(s) brings her claims contained in the Complaint under federal diversity jurisdiction, 28 U.S.C. § 1332(a)(1), as the parties are completely diverse in citizenship and the amount in controversy exceeds $75,000.

35.     Pursuant to K.S.A. § 60-308(b)(2), defendants. purposefully availed themselves of the protections and/or benefits of the laws in Kansas by committing tortious acts within the state including, but not limited to, failing to ensure that SHRC had appropriate policies and procedures for its nursing staff, was properly capitalized, funded, staffed, and that staff received adequate training and supervision, thereby making jurisdiction proper in this Court.

36.     A substantial part of the events or omissions giving rise to the claims described in the Complaint occurred in Kansas, thereby making venue proper in this Court.

### AGENCY

37.     Plaintiff(s) incorporates by reference the allegations previously set forth and further alleges as follows:



*Filing of*
*Steele Chaffee*

38.     The acts hereinafter described were performed by the agents, representatives, servants, and employees of Defendants and were performed either with the full knowledge and consent of Defendants, and/or were performed by their agents, representatives, servants, or employees during the scope of their agency, representation, or employment with the Defendants.

39.     Furthermore, the acts hereinafter described as being performed by the agents, representatives, servants, or employees of Defendants were performed or were supposed to be performed on behalf of and/or for the benefit of Resident.

## FACTUAL BACKGROUND

40.     Plaintiff(s) incorporates by reference the allegations previously set forth and further alleges as follows:

### SHRC; HGT; HMGS and HMGH's Treatment of Resident

41.     Upon information and belief, Resident was at risk for developing falls.

42.     Upon information and belief, despite Resident's risk for falls, none of the Facility staff created a Care Plan for resident that implemented the appropriate interventions, including a turning and repositioning program, that would offload the pressure on Resident's skin.

43.     Upon information and belief, none of the Facility staff implemented or applied the appropriate interventions to address Resident's risk of falls, nor did the Facility staff turn or reposition Resident to offload the pressure on Resident's skin, nor did any of the staff properly monitor Resident's skin for the development of falls.

44.     Upon information and belief, from admission to her discharge, none of the Facility staff:



    a.   Properly assessed Resident's risk of developing skin breakdown or falls;

    b.   Implemented or provided the appropriate interventions to prevent Resident from falling, including appropriate supervision and fall preventions;

    c.   Monitored or evaluated Resident's Care Plan to see if the interventions prescribed were working; or

    d.   Monitored Resident's condition, including Resident's risk for falling during this time frame.

45.    Upon information and belief, at no point while Resident was a resident at the Facility did any of the Facility management, including the Administrator, the Director of Nursing, the clinical education coordinator, anybody from SHRC, HGT, HMGS, or HMGH, or any other staff member ever provide any sort of in-service training or clinical education to the Facility staff regarding the assessment, prevention, use of interventions, monitoring, and reporting of falls or skin breakdown in residents like Resident.

46.    Upon information and belief, at no point while Resident was a resident at the Facility did any of the Facility management, including the Administrator, the Director of Nursing, the clinical education coordinator, anybody from SHRC, HGT, HMGS, and HMGH, or HMGS or any other staff member ever implement the appropriate policies and procedures at the Facility regarding the assessment, prevention, use of interventions, monitoring, and reporting of falls in residents like Resident.

47.    Upon information and belief, while Resident was a resident at the Facility, the Facility did not have an adequate amount of staff working on a daily basis at the Facility to meet Resident's needs, perform the interventions required to prevent Resident's avoidable fall, or monitor and adequately supervise Resident's condition.

 *Filing of Steele Chaffee*

### Cost Reporting & Staffing Information

48.     Nursing facilities, like the Facility, are required to submit an annual "Cost Report" to CMS, known as "CMS Form 2540-10".  The cost report is a financial report that identifies the cost and charges related to healthcare treatment activities in a particular nursing facility.

49.     Included with the cost reports are extensive details as to how much money the nursing facility spent on RNs, LPNs, and CNAs.  The cost reports reflect the patient census, hours paid, and the hourly rate that the nursing facility paid each category of direct caregivers.

50.     By dividing the paid hours by the patient census in the facility it is possible to determine how many hours the nursing facility paid for each category of direct caregivers per resident per day for the time period covered by that particular cost report.  This number is referred to as the "reported HPPD".

51.     CMS allows the facilities to include all paid hours in the "reported HPPD."  Thus, that number does actually reflect true direct care hours, but is inflated due to the fact that "hours paid" includes sick pay and vacation pay both of which reduce the amount of actual HPPD provided by caregivers to residents in nursing facilities.

52.     The Facility was also required to report quarterly staffing information through the CMS "Payroll Based Journal" (PBJ) program.


*Filing of*
*Steele Chaffee*

53.     To determine more accurate direct-care hours, it is necessary to examine the data that nursing facilities use to track the number of hours their employees work.  This information is easily accessed through reports that are commonly referred to as "Time Detail Reports", "Punch Detail Data Reports", or some other similarly named report depending on the time-keeping system used by the particular nursing facility.

54.     The more detailed Punch Detail or time records will note vacation or sick time paid and thus, reveal actual hours worked in the facility.  This information reveals a more accurate direct care number and allows the calculation of the actual HPPD for any period of time including a year, a quarter, a month, or a day.

55.     Upon information and belief, the staffing levels reported by the Facility skilled nursing & therapy for the time period Resident was at the Facility were below the CMS expected levels derived from the MDS RUG rates which reflect actual acuity and not simply a resident census.

56.     Upon information and belief, the staffing levels reported by the Facility skilled nursing & therapy for the time period Resident was at the Facility were below the CMS expected levels derived from the MDS RUG rates which reflect actual acuity and not simply a resident census.



### Undercapitalization/Underfunding at the Facility

57.     HMGH, HMGS, HGT, and SHRC had a duty to provide financial resources and support to the Facility in a manner that would ensure that each of their residents received the necessary care and services and attain or maintain the highest practicable physical, mental, and psychosocial well-being, consistent with their residents' comprehensive assessments and plans of care.

58.     HMGH, HMGS, HGT, and SHRC had a duty to provide sufficient financial resources to ensure there was enough properly trained and supervised staff to meet the needs of their residents.

59.     Upon information and belief, SHRC had no autonomy to decide their own financial course, including no authority to determine how much staff they could provide or what resources were available to the staff.

60.     Upon information and belief, no individuals at the Facility are involved in decision making about the financial operations or what its resources were and where they would be spent.

61.     Transactions directed by HGT HMGS, and HMGH left the Facility with insufficient cash to provide sufficient qualified staff to meet the individual needs of the residents in their facility during Resident's time there.

### LEGAL BASIS FOR HGT, HMGS, and HMGH's LIABILITY
### Joint Venture/Enterprise

62.     HGT, HMGS, and HMGH are collectively referred to herein as the "Corporate Defendants."



63.    The Corporate Defendants directed, operated and managed the day-to-day functions of their nursing facilities – including the Facility – by developing and implementing policies, practices and procedures affecting all facets of the Facility, including resident care.

64.    These policies manipulate and control the physical and financial resources, and prohibit decision making at the Facility level.

65.    This directly affects resident care by determining things such as what type and quality of nourishment is available for residents; what safety measures may and may not be used depending upon cost; the integrity of the building itself; and most importantly, how much staff is available to provide resident care and how well trained and supervised are the staff to meet the needs of the residents.

66.    The Corporate Defendants affirmatively chose and decided to establish such operations and demand they be implemented.

67.    Upon information and belief, such operations included, *inter alia*, the following dangerous policies and practices: (a) the aggressive recruitment and admission of high acuity patients to increase the patient census when Defendants had already chosen to understaff the Facility and continually maintain a staff that were not qualified nor competent to provide the care required by state law, regulations and minimum standards of the medical community; and (b) the decision to retain residents whose needs exceeded the qualification and care capability of the facility's staff.



68.     The Corporate Defendants consciously chose not to implement safety policies, procedures and systems which would ensure that: (a) the acuity levels and needs of residents were consistent with the numbers and qualifications of direct caregivers; and (b) treatment/care prescribed by a physician was provided in accordance with state laws and professional standards.

69.     The Corporate Defendants, conduct themselves in a manner which indicates a joint venture/enterprise amongst them, to wit:

    a.   The shared interest in the operation and management of nursing facilities;

    b.   The express and implied agreements amongst them to share in the profits and losses of such venture/enterprise; and

    c.   The obvious actions taken showing the cooperation in furthering the venture/enterprise operating and managing nursing facilities.

70.     Kansas law recognizes a joint venture/enterprise where the parties alleged to be partners in such venture/enterprise share a common interest in the property or activity or the joint venture; maintain agreements, either express or implied, to share in profits or losses of the venture/enterprise; and express actions or conduct showing cooperation in the project of the venture/enterprise.

71.     The Corporate Defendants share a common interest in the operation and management of nursing facilities, including the Facility; maintain agreements to share in the profits or losses of the operation of nursing facilities described herein; and operate on a daily basis evincing conduct which indicates their cooperation in the venture of operating and managing nursing facilities for profit.

72.     The Corporate Defendants and SHRC took direct, overt and specific actions to further the interest of the joint enterprise.

 *Filing of*
*Steele Chaffee*

73.     These actions were taken through a joint venture/enterprise or through the Corporate Defendants and SHRC's officers, directors, managers and or employees.

74.     The Corporate Defendants had an equal right to share in the profits and to bear liability for, the joint venture/enterprise.

75.     Further, because the Corporate Defendants and SHRC were dominated by each other, these entities had an equal right to direct or control their venture as a whole, as well as to direct or control the operation and management of the Facility.

### Direct Participation/Individual Actions

76.     The Corporate Defendants were at all times material to this lawsuit in the business of managing, owning and operating a network of nursing homes throughout the State of Kansas. One such nursing home was the Facility where Resident was admitted for care and treatment.

77.     At all times material to this lawsuit, the Corporate Defendants were fully aware that the delivery of essential care services in each of their nursing homes – including the Facility – hinged upon three fundamental fiscal and operational policies which were dictated by their choices on establishing and implementing such policies: (1) the determination of the numbers and expenditures on staffing levels; (2) the determination of the census levels within the nursing home; and, (3) payor mix.

78.     At all times material, the Corporate Defendants made critical operational decisions and choices which manipulated and directly impacted the Facility's revenues and expenditures. More particularly, the Corporate Defendants determined:

      a.   The number of staff allowed to work in their chains of nursing homes including the Facility;



b.    The expenditures for staffing at the nursing homes including the Facility;

c.    The revenue targets for each nursing home including the Facility;

d.    The payor mix, and, census targets for each nursing home including the Facility;

e.    Patient recruitment programs and discharge practices at each nursing home including the Facility.

79.    All cash management functions, revenues and expenditure decisions at the nursing home level – including the Facility – were tightly managed, directed, and supervised by the Corporate Defendants.

80.    It was the choices made by the Corporate Defendants which directly fixed the circumstances in the facilities and the level of care that could, and was, provided at the homes, including the Facility.

81.    The Corporate Defendants formulated, established and mandated the application and implementation of the policies regarding the staffing levels and expenditures, the census levels, and payor mix.

82.    The census edicts, marketing and admission practices, and resident discharge policies designed and mandated by the Corporate Defendants were implemented and such application was carefully supervised and enforced.

83.    Following the mandates, the Facility functioned in accordance within them, filling empty beds, recruiting high acuity patients, and maintaining a census level and staffing level established and enforced as the Corporate Defendants deemed appropriate.



84.     Accordingly, such manipulation by the Corporate Defendants as to staffing and census were motivated by the financial needs of the Corporate Defendants and the Facility as opposed to the acuity levels and needs of the residents as dictated by state and federal laws and regulations.

85.     Instead of abiding by their duty to care for the residents, the Corporate Defendants chose to be guided by financial motivation which was simply to increase revenues while restricting and/or reducing expenses.

86.     The Corporate Defendants, therefore, directly participated in a continuing course of negligent conduct, requiring the Facility to recruit and retain heavier care, higher pay residents to the Facility even though the needs of the patient population far exceeded the capacity of staff.

87.     At the same time, the Corporate Defendants chose to design, create, implement and enforce operational budgets at the Facility which dictated the level of care that could be provided and therefore deprived residents care, creating widespread neglect.

88.     In so doing, the Corporate Defendants disregarded, superseded, and violated the duties and responsibilities imposed on a licensed nursing home, in this case the Facility, by the State of Kansas, and the federal government.


SC Filing of Steele Chaffee

**Corporate Malfeasance**

89.     The Corporate Defendants consciously chose not to implement safety policies, procedures and systems which would ensure that: (1) the acuity levels and needs of residents were consistent with the numbers and qualifications of direct caregivers; and (2) treatment/care prescribed by a physician was provided in accordance with state laws and professional standards.

90.     Accordingly, the Corporate Defendants, by their operational choices and decision making, and in order to satisfy their desire to grow profits, created a dangerous condition that caused harm to residents.

91.      These choices to establish and implement such policies and the conscious decision not to implement corrective actions or procedures disregarded the duties which the State of Kansas and federal government imposed upon the Corporate Defendants and the Facility.

92.     Because the staffs were below necessary levels, and because the staffs that were present were not properly qualified or trained, the residents at the Facility including Resident, failed to receive even the most basic care required to prevent catastrophic injury and death.  This negligence and resulting injuries ultimately led to and caused Resident's injuries and death as described above.

93.     During Resident's residency at the Facility, Resident sustained physical injuries and died, as described in more detail above, as a result of the acts, omissions, decisions and choices made by the Corporate Defendants in operating the Facility.



*Filing of*
*Steele Chaffee*

94.    During Resident's residency at the Facility, the Corporate Defendants negligently failed to provide and/or hire, supervise and/or retain staff capable of providing Resident with a clean, safe and protective environment, and that, as a result of this failure, Resident suffered neglect, abuse, severe personal injuries, conscious pain and suffering, and deterioration of Resident's physical condition as further described above.  Ultimately, Resident died as a result of this failure.

95.    The Corporate Defendants manage, operate and direct the day-to-day operations of the Facility and these Corporate Defendants are liable for this direct involvement in the operations of such Facility. These Corporate Defendants are therefore liable to the Plaintiff(s) for the neglect of and injuries to Resident.

96.    The Facility and these Corporate Defendants have been named as Defendants in this lawsuit for their individual and direct participation in the torts and causes of action made the basis of this lawsuit, having:

   a.    Chosen to disregard the duties and responsibilities which the Facility, as a licensed nursing home, owed to the State of Kansas and its residents;

   b.    Created the dangerous conditions described by interfering with and causing the Facility to violate Kansas statutes, laws and minimum regulations governing the operation of said nursing home;

   c.    Superseding the statutory rights and duties owed to nursing home residents by designing and mandating dangerous directives, policies, management and day to day operation of the Facility;

   d.    Caused the harm complained of herein; and

   e.    Choosing to disregard the contractual obligations owed to the State of Kansas and the Federal Government to properly care for the residents in exchange for payment of funds for such care.


Filing of
Steele Chaffee

## COUNT I - (Wrongful Death v. All Defendants)

97.    Plaintiff(s) incorporates by reference the allegations previously set forth and further alleges as follows:

98.    At all times material hereto Resident was in a defenseless and dependent condition.

99.    As a result of Resident's defenseless and dependent condition, Resident relied upon Defendants to provide for their safety, protection, care and treatment.

100.    At the time of the negligent acts and occurrences complained of herein and at all other times relevant hereto, Defendants, and their agents and employees, owed a legal duty to Resident to exercise that degree of skill and learning ordinarily exercised by members of their respective professions under the same or similar circumstances.

101.    At all relevant times, Defendants had a duty to act in accordance with the standards of care required of those owning, operating, managing, maintaining, and/or controlling a skilled nursing Facility.

102.    These duties required Defendants to implement and enforce policies and procedures to ensure the proper care for, and treatment of all residents including Resident.

103.    These duties required Defendants to have sufficient and qualified staff at the Facility nursing home to ensure the proper care for, and treatment of all residents including Resident.

104.    These duties required Defendants to ensure that the Facility's nurses and other staff were properly educated and trained with regard to the care for, and treatment of all residents including Resident.

 *Filing of*
*Steele Chaffee*

105.    These duties required Defendants to ensure that the Facility was properly capitalized to ensure the proper care for, and treatment of all residents including Resident.

106.    Specifically, during the course of their care and treatment of Resident, Defendants and their agents, servants, and/or employees breached their duties and were guilty of the following acts of negligence and carelessly by failing to measure up to the requisite standard of care, skill, and practice ordinarily exercised by members of their profession under the same or similar circumstances, including by:

   a.   Failing to adequately assess, monitor, document, treat, and respond to Resident's physical condition as well as Resident's skin condition;

   b.   Failing to adequately assess Resident's risk of developing falls;

   c.   Failing to timely, consistently, and properly monitor, assess, and document Resident's physical condition;

   d.   Failing to provide adequate nursing staff to ensure Resident's 24-hour protective oversight and supervision;

   e.   Failing to have a sufficient number of staff at the Facility to ensure Resident's needs were being met with regard to skin care and fall prevention;

   f.   Failing to provide adequate assistive devices and interventions to prevent Resident's falls;

   g.   Failing to enact and carry out an adequate Care Plan in regard to Resident's increased risk for falls;

   h.   Failing to provide adequate preventative skin care to Resident;

   i.   Failing to provide adequate assistance and assistive devices to prevent Resident's falls;

   j.   Failing to turn and reposition Resident every two (2) hours;

   k.   Failing to utilize proper procedures for scheduling of turning and repositioning;

   l.   Failing to adequately assess, monitor, ensure, and document the administration of adequate nutrition and hydration to Resident;



m.  Failing to adequately and concisely document the measurement of Resident's wounds for proper and efficient wound treatment, management, and progression;

n.  Failing to prevent the development and worsening of Resident's falls;

o.  Failing to timely report Resident's changes in condition to a physician;

p.  Failing to carry out the instructions of Resident's physician;

q.  Failing to adequately, timely and consistently prevent, assess, and treat Resident's risk of falling;

r.  Failing to timely transfer Resident to a Facility that could provide adequate care;

s.  Failing to properly supervise and train the employees, agents and/or servants of the Defendants who were responsible for the care and treatment of Resident;

t.  Failing to have and/or implement appropriate policies and procedures regarding the prevention, assessment, and treatment of pressures ulcers in residents like Resident;

u.  Failing to carry out and follow standing orders, instructions and protocol regarding the prevention of Resident's falls;

v.  Failing to ensure the nursing home was properly capitalized.

w.  Failing to perform and measure up to the requisite standards of care required and observed by health care providers and further particulars presently unknown to Plaintiff(s), but which is verily believed and alleged will be disclosed upon proper discovery procedures in the course of this litigation.

107.  As a direct and proximate result of the individual and collective acts of negligence of Defendants as described above, Resident was harmed and suffered non-economic damages, including pain, suffering, mental anguish, disability, disfigurement, and loss of enjoyment of life; death; and other damages.

108.  As a direct and proximate result of the individual and collective acts of negligence of all Defendants as described above, Plaintiff(s) suffered non-economic damages including, loss of companionship, loss of comfort, loss of guidance, loss of counsel and loss of instruction, pain, suffering, bereavement and mental anguish.

 Filing of Steele Chaffee

WHEREFORE, Plaintiff(s) (individually), prays for judgment against Defendants in an amount in excess of $75,000.00 and in an amount a jury deems fair and reasonable including only non-economic damages.

## COUNT II - (Alter Ego v. Defendants HGT, HMGS, and HMGH)

109.    Plaintiff(s) incorporate by reference the allegations previously set forth and further alleges as follows:

110.    For the purposes of this Count Defendants HGT, HMGS, and HMGH are hereinafter referred to as the "Alter Ego Defendants".

111.    SHRC ("Subsidiary") is so dominated by the Alter Ego Defendants that the Subsidiary is a mere instrument of the Alter Ego Defendants and are indistinct from the Alter Ego Defendants.

112.    In fact, the Subsidiary is controlled and influenced by the Alter Ego Defendants in that the Alter Ego Defendants exercised complete control and domination over the Subsidiary finances and business practices.

113.    Specifically, the Alter Ego Defendants' complete control and domination over the Subsidiary caused the Facility's undercapitalization and understaffing while Resident was at the Facility.

114.    Upon information and belief, the Alter Ego Defendants' complete control and domination over the Subsidiary caused the Subsidiary to operate at a loss during the years of 2020 and 2021.



115.    Upon information and belief, the Alter Ego Defendants' complete control and domination over the Subsidiary caused the Subsidiary's liabilities to exceed its assets by during the years 2020 and 2021.  Specifically:

      a.   The Alter Ego Defendants own all or most of the capital stock of the Subsidiary;

      b.   The Alter Ego Defendants and the Subsidiary have common directors or officers;

      c.   The Alter Ego Defendants finance the Subsidiary;

      d.   The Alter Ego Defendants subscribe to all of the capital stock of the Subsidiary;

      e.   The Alter Ego Defendants caused the incorporation of the Subsidiary;

      f.   The Facility has grossly inadequate capital;

      g.   The Alter Ego Defendants pay the salaries and other expenses or losses of the Subsidiary;

      h.   The Alter Ego Defendants use the property of the Subsidiary as its own; and

      i.   The directors or executives of the Subsidiary do not act independently in the interest of the Subsidiary but take their orders from the Alter Ego Defendants in the latter's interest.

116.    Thus, the Alter Ego Defendants used the corporate cloak of the Subsidiary as a subterfuge to defeat public convenience, to justify a wrong, and/or to perpetrate a fraud in that the Alter Ego Defendants' complete control and domination of the Subsidiary depleted all of the Subsidiary's assets, thereby making it unable to pay a judgment resulting from its care of residents including Resident.

117.    This undercapitalization and understaffing violated SHRC's duties and the applicable standard of care owed by a nursing home operator or manager to the Facility's residents.


Filing of
Steele Chaffee

118.    As a direct and proximate result of the individual and collective acts of negligence of the Subsidiary – and the Alter Ego Defendants – Resident was harmed and suffered non-economic damages including pain, suffering, mental anguish, disability, disfigurement, and loss of enjoyment of life, death, and other damages.

119.    As a direct and proximate result of the individual and collective acts of negligence of the Subsidiary, – and the Alter Ego Defendants – Plaintiff(s), suffered non-economic damages including loss of companionship, loss of comfort, loss of guidance, loss of counsel and loss of instruction, pain, suffering, bereavement and mental anguish.

WHEREFORE, Plaintiff(s), prays for judgment against the Defendants in an amount in excess of $75,000.00 and in an amount a jury deems fair and reasonable under the circumstances, including only non-economic damages.

### COUNT III - (Pain and Suffering by the Estate v. All Defendants)

120.    Plaintiff(s) incorporates by reference the allegations previously set forth and further alleges as follows:

121.    At all times material hereto Resident was in a defenseless and dependent condition.

122.    As a result of Resident's defenseless and dependent condition, Resident relied upon Defendants to provide for their safety, protection, care and treatment.

123.    At the time of the negligent acts and occurrences complained of herein and at all other times relevant hereto, Defendants, and their agents and employees, owed a legal duty to Resident to exercise that degree of skill and learning ordinarily exercised by members of their respective professions under the same or similar circumstances.


Filing of
Steele Chaffee

124.    At all relevant times, Defendants had a duty to act in accordance with the standards of care required of those owning, operating, managing, maintaining, and/or controlling a skilled nursing Facility.

125.    These duties required Defendants to implement and enforce policies and procedures to ensure the proper care for, and treatment of all residents including Resident.

126.    These duties required Defendants to have sufficient and qualified staff at the Facility to ensure the proper care for, and treatment of all residents including Resident.

127.    These duties required Defendants to ensure that the Facility's nurses and other staff were properly educated and trained with regard to the care for, and treatment of all residents including Resident.

128.    These duties required Defendants to ensure that the Facility was properly capitalized to ensure the proper care for, and treatment of all residents including Resident.

129.    Specifically, during the course of their care and treatment of Resident, Defendants and their agents, servants, and/or employees breached their duties and were guilty of the following acts of negligence and carelessly by failing to measure up to the requisite standard of care, skill, and practice ordinarily exercised by members of their profession under the same or similar circumstances, including by:

      a.   Failing to adequately assess, monitor, document, treat, and respond to Resident's physical condition as well as Resident's skin condition;

      b.   Failing to adequately assess Resident's risk of developing falls;

      c.   Failing to timely, consistently, and properly monitor, assess, and document Resident's physical condition;


Filing of
Steele Chaffee

d.  Failing to provide adequate nursing staff to ensure Resident's 24-hour protective oversight and supervision;

e.  Failing to have a sufficient number of staff at the Facility to ensure Resident's needs were being met with regard to skin care and fall prevention;

f.  Failing to provide adequate assistive devices and interventions to prevent Resident's falls;

g.  Failing to enact and carry out an adequate Care Plan in regard to Resident's increased risk for falls;

h.  Failing to provide adequate preventative skin care to Resident;

i.  Failing to provide adequate assistance and assistive devices to prevent Resident's falls;

j.  Failing to turn and reposition Resident every two (2) hours;

k.  Failing to utilize proper procedures for scheduling of turning and repositioning;

l.  Failing to adequately assess, monitor, ensure, and document the administration of adequate nutrition and hydration to Resident;

m.  Failing to adequately and concisely document the measurement of Resident's wounds for proper and efficient wound treatment, management, and progression;

n.  Failing to prevent the development and worsening of Resident's falls;

o.  Failing to timely report Resident's changes in condition to a physician;

p.  Failing to carry out the instructions of Resident's physician;

q.  Failing to adequately, timely and consistently prevent, assess, and treat Resident's risk of falling;

r.  Failing to timely transfer Resident to a Facility that could provide adequate care;

s.  Failing to properly supervise and train the employees, agents and/or servants of the Defendants who were responsible for the care and treatment of Resident;

t.  Failing to have and/or implement appropriate policies and procedures regarding the prevention, assessment, and treatment of pressures ulcers in residents like Resident;

u.  Failing to carry out and follow standing orders, instructions and protocol regarding the prevention of Resident's falls;

v.  Failing to ensure the nursing home was properly capitalized.



w. Failing to perform and measure up to the requisite standards of care required and observed by health care providers and further particulars presently unknown to Plaintiff(s), but which is verily believed and alleged will be disclosed upon proper discovery procedures in the course of this litigation.

130.    As a direct and proximate result of the individual and collective acts of negligence of Defendants as described above, Resident was harmed and suffered non-economic damages, including pain, suffering, mental anguish, disability, disfigurement, and loss of enjoyment of life.

131.    The actions of defendants were malicious, wanton, grossly negligent and reckless, and performed in reckless disregard of the welfare and safety of Resident and others, such that, in addition to damages for pain and suffering, defendants are liable for punitive damages for their grossly negligent care of Resident.

132.    At the time defendants caused and allowed Resident to suffer an avoidable fall, they knew that their conscious disregard to provide adequate staff; properly capitalize Facility, train, and/or supervise their agents, servants and/or employees during 2020 and 2021 created a high degree of probability of injury to residents, and consciously disregarded the safety of all residents including Resident.

133.    Accordingly, defendants showed a complete indifference to, or conscious disregard, for the safety of others, including Resident and warrants punitive damages be assessed against defendants in an amount that is fair and reasonable and will punish defendants and deter them and others from similar conduct.



Filing of
Steele Chaffee

134.    As a direct and proximate result of defendants' negligence, and complete indifference to, or conscious disregard, for the safety of others, including Resident, Resident was harmed and suffered non-economic damages, including pain, suffering, mental anguish, disability, disfigurement, and loss of enjoyment of life.

135.    The Estate is entitled to a jury trial as to the amount of punitive damages pursuant to the Seventh Amendment of the United States Constitution *and Jones v. United Parcel Services, Inc.*, No. 09–3275 (10th Cir. 2011).

WHEREFORE, Plaintiff(s) (The Estate) prays for judgment against Defendants in an amount in excess of $75,000.00 and in an amount a jury deems fair and reasonable under the circumstances, including only non-economic damages.

<u>**PLAINTIFF(S) DEMAND A JURY TRIAL ON ALL ISSUES SO TRIABLE**</u>

Respectfully Submitted,

STEELE CHAFFEE, LLC

By:    */s/ Jonathan Steele*
Jonathan Steele  MO #63266
Kevin Chaffee    MO #63462
2345 Grand Boulevard, Suite 750
Kansas City, MO 64108
Ph: (816) 466-5947
Fax: (913) 416-9425
jonathan@nursinghomeabuselaw.com
kevin@nursinghomeabuselaw.com

ATTORNEYS FOR PLAINTIFF(S)

I hereby certify that the below-signed Attorney signed the original of the above and foregoing and is maintaining the original copy at said Attorney's office.


Filing of
Steele Chaffee

*/s/ Jonathan Steele*
_____
Attorney for Plaintiff(s)

